### IACOMINI'S RESTAURANT, INC., v. HOTEL EMPLOYEES LOCAL NO. 118, et.

Common Pleas Court, Summit County.

No. 166,688.   Decided August 24, 1948.

Stephen J. Wozniak, Claude Herman, Akron, for plaintiff. Don Isham, Akron, for defendant.

## OPINION

By WATTERS, J.

Plaintiff is an Ohio corporation owned and operated by the Iacomini family, engaged in the business of operating a very fine restaurant on West Exchange Street in the City of Akron. The defendant, Hotel and Restaurant Employees and Bartenders Local No. 118, is an A. F. of L. union, and other defendants are officers and representatives of said union.

The evidence, with the exception of certain affidavits filed by each side in re certain claimed and denied misconduct of pickets before the court granted a temporary injunction allowing peaceful picketing and regulating same, was received in the nature of a stipulation by opening statements of the parties, an examination of which will show practically an agreed statement of facts, from which the court finds:

That the restaurant is a non union business. None of the employees belong to the defendant union or any union.

That there is no dispute as to wages, hours, or other such matters, between the employer and its employees.

On or about May 10, 1948, the defendants, the Raleighs, as officers of the union, caused a letter to be sent to plaintiff enclosing a proposed agreement between the plaintiff company and the union (Plaintiff's Exhibit 5), which plaintiff contends provides for a closed shop.

On this matter it was further stipulated by counsel as follows: (page 19 of opening statements)

"MR. HERMAN: (for Plaintiff) I understand it is further stipulated by and between the parties that if Iacomini's Restaurant becomes a union restaurant, so called, and would sign a contract of the type and form submitted as Plaintiff's Exhibit 5, the picketing by the defendants would then cease, is that correct?

MR. ISHAM: (for Defendants) That is in substance true. I think for the purpose of this record I might state that if a contract, such as the copy submitted to Mrs. Iacomini, which is a comparable contract used by all union restaurants— that if a contract was negotiated satisfactory to both parties, whereby union help was employed and the conditions required of a union establishment carried out, there would be no necessity for picketing, no purpose of picketing, and certainly the pickets would be removed."

The proposed contract covered employment, wages, hours and working conditions, dismissals, deductions, meals, uniforms and equipment, vacations, overtime and various other matters. In re employment the proposed agreement reads as follows:

### "3-EMPLOYMENT

"The Employer agrees to hire and retain in his employ no other employees of the classes herein mentioned, but members in good standing in the Union. In the event the Union is unable to supply satisfactory employees, the Employer may engage non-union employees, thus engaged shall not be objectionable to the Union, and that they shall secure a short time card or working permit from the Union within forty-eight hours after entering the employ of the house; and provided further that they shall perfect their membership in the Union within seven (7) days from the date of being engaged."

This, in the court's opinion, coupled with the stipulations of counsel (see above from page 19 of the record) constituted a closed shop demand, along with other demands as enumerated above.

At or about this time, May 10, 1948, the plaintiff having refused to enter into said proposed agreement (Exhibit 5) picketing started. None of the pickets are or have been employees of the plaintiff company.

After the picketing started, and before the temporary injunction was ordered by Judge Harvey, the matters covered in the plaintiff's and defendants' affidavits occurred.

Without going into any great detail, I find that on several occasions the pickets went beyond the rules of proper and peaceful picketing. They engaged in some very indecent language, some veiled and unveiled threats to customers, and there was some jostling and pushing of customers. There were too many pickets, and either they had not been properly instructed as to what is peaceful picketing, or they lost their heads.

However, while such conduct was absolutely wrong and inexcusable, it was not what could be called extreme violence in the sense the courts use that term, although subject to regulation and restriction. It was not such violence, etc. the threat of which would continue over under a peaceful picketing permission, under the theory of the Meadowmoor case discussed later.

Thereafter Judge Harvey entered a preliminary injunction, limiting the pickets to two, and putting other restrictions on the picketing operation. (See Journal Entry.)

Thereafter things went along without any real difficulties until the evening of the day the matter was before this court, when there was some disturbance between one of the Iacominis and a picket and a friend of a picket. No evidence was had on that matter, and the court, therefore, does not know who was at fault, but upon conference with the court, and by agreement, the number of pickets was reduced to one, and some further modifications were made as to the manner of walking up and down, and so forth.

As each side has abandoned any right to offer evidence upon that flare-up, it is not before the court, and was probably a case of nervous tension, and not too serious either way.

What both sides often forget in these disputes is that "obedience to law is liberty", and that without such obedience and respect, we have chaos.

In 1941 in Milk Drivers Union of Chicago v. Meadowmoor Dairies, Inc., 312 U. S., 287, the court held:

Syllabus:

(1) A State is at liberty under the Fourteenth Amendment to use injunctive powers vested in its courts for the prevention of violence by labor unions in industrial disputes.

(2) And where the controversy is attended by peaceful picketing and by acts of violence, and the violence has been such that continuation of the picketing will operate coercively by exciting fear, that violence will be resumed, an injunction by a state court forbidding the picketing as well as the violence does not infringe the Fourteenth Amendment.

The court said on page 294:

"The picketing in this case was set in a background of violence. In such a setting it could justifiably be concluded that the momentum of fear generated by past violence would survive even though future picketing might be wholly peaceful."

Further the court held in Syllabus No. 5:

"The present decision does not bar resort to the state court for a modification of the terms of the injunction should that court find that the passage of time has deprived the picketing of its coercive influence."

In other words, at that time peaceful picketing could again be resumed

In the same case Justice Reed, dissenting, said in part at page 320:

"This nation relies upon public discussion as one of the indispensable means to attain correct solutions of problems of social welfare. Curtailment of free speech limits this open discussion. Our whole history teaches that adjustment of social relations through reason is possible while free speech is maintained. * * * Free speech may be absolutely prohibited only under the most pressing national emergencies. * * *."

Justice Reed was of the opinion that peaceful picketing should have been allowed; that no such emergency existed as would require the court to enjoin freedom of speech, that is peaceful persuasion or peaceful picketing, even admitting the original violence that occurred.

312 U. S., 321, A. F. of L. v. Swing (1941) Syllabus:

"The Constitutional guarantee of freedom of discussion is infringed by the common law policy of a State limiting peaceful picketing by labor unions to cases in which the controversy is between the employer and his employees."

On page 326 the court said:

"The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."

The union sought unsuccessfully to unionize a non-union beauty-parlor business. Picketing of the shop followed. The court held peaceful picketing permissible. There was some claim or question of violence, and so forth, but for the purpose of the decision, the court said that the state of the record made it necessary to disregard the question of violence.

In the case of Crosby v. Roth, et al, 136 Oh St 352, 6 O. O. 496, the Ohio Supreme Court enjoined all picketing, even peaceful picketing, on the grounds that there was no legitimate trade dispute. This case was decided in January, 1940.

It will be noted that the union here sought to unionize the restaurant involved, and that none of the employees belonged to any union, nor was there any dispute between the employer and employees. Furthermore, there was extreme violence before the temporary injunction was issued by the trial court. The slashing of patrons' automobile tires, assaulting of employees and customers, throwing of stench bombs, and dynamiting of the employer's former residence, and other acts of violence occurred.

In my opinion, under the opinion of the Supreme Court of the United States, in the case of A. F. of L. v. Swing, 312 U. S. 321, February 10th, 1941, discussed herein, there was a legitimate trade dispute, but even so, if the Supreme Court of the United States had let it in, and had decided it, peaceful picketing would not have been allowed, because the United States Supreme Court held (Feb. 10, 1941) in the Milk Drivers Union v. Dairies, etc. 312 U. S. 287, that where the violence is of such magnitude originally that continuation of peaceful picketing will operate coercively, by exciting fear that the former violence will be resumed, then all picketing will be enjoined.

It will be noted that the Ohio Supreme Court decision was in January, 1940, while the other two United States Supreme Court cases were decided February 10, 1941.

It will also be noted that the majority opinion makes no mention of the free speech doctrine laid down by the United States Supreme Court in the Swing and Milk Drivers cases. However, Judge Zimmerman in his dissenting opinion does recognize it and discusses it well and favorably as the law of the land.

In referring to the matter of past violence, Judge Zimmerman made this pertinent and sound observation:

"Responsible labor leaders realize that the pursuit of illegal methods to bring about what may be a desirable result is harmful to the labor movement as a whole, and arouses public opinion against the cause of organized labor."

From the very fine article of Clare Fahrer, senior student, Law School Cincinnati University, in Ohio Law Reporter, May 31, 1948, citing many cases in re picketing, I quote:

"The United States Supreme Court denied certiorari of the Crosby case on the same day that the A. F. of L. v. Swing opinion was handed down. It may be that the existence of violence in the Crosby case was such that the court did not believe it was a proper link to fit in the chain of decisions on 'picketing as free speech' * * * Certainly the Ohio Supreme Court's opinion paid scant heed to any question of infringement on the right of free speech. At any rate the rule of the Swing decision has been considered to be broad enough to limit substantially if not completely to overthrow the authority of Crosby v. Roth."

**24 O. Jur., page 639, paragraph 35,** has this to say on "Closed Shop Agreements":

"Contracts for the employment of union labor exclusively have generally been sustained as against the objection that they are invalid on the ground of public policy. It has been said by an Ohio court that contracts made by the employer for the exclusive employment of union labor are valid, particularly where the supply of union labor is adequate, or where provision is made for the unionizing of workmen in case of shortage. (Citing **8 Oh Ap 437.**) But such contracts * * * are contrary to public policy when they take in an entire industry in a community of any considerable proportions * * * to prevent * * * craftsmen from working at their craft * * * without joining a union." (Citing **20 Oh Ap 317.**)

This same principle was involved in **Scaggs v. Transportation Union, 31 Abs. 689,** discussed more fully later, where a whole industry, that is, a practical monopoly, was involved.

See **Clark Lunch v. Waiters Union, 22 Oh Ap 265**, and cases there cited, where the union, for all practical purposes, demanded a **closed shop** and other regulations. The court held peaceful picketing permissible.

In 1915 the Ohio Supreme Court, in **92 Oh St, 130, Jackson v. Berger**, held the following statute, §12943 GC, unconstitutional.

"Whoever * * * coerces or attempts to coerce employees by discharging or threatening to discharge them from their employ * * * because of their connection with such (lawful) labor organization, shall be fined, etc.

The Supreme Court said in substance:

"On January 25, 1915, the Supreme Court of the United States, in the case of Coppage v. Kansas, held that a Kansas statute similar to the above Ohio statute was violative of the federal constitution. * * *."

The court then said that such a ruling of the United States Supreme Court **was binding upon the Ohio Supreme Court.**

"Sec. 6241-1 GC. Every undertaking or promise hereafter made, whether written or oral, express or implied, constituting or contained in any contract or agreement of hiring or employment between any individual, firm, company, association or corporation, and any employee or prospective employee of the same, whereby (a) either party to such contract or agreement undertakes or promises not to join, become, or remain a member of any labor organization, or of any organization of employers, or (b) either party to such contract or agreement undertakes or promises that he will withdraw from the employment relation in the event that he joins, becomes, or remains a member of any labor organization or of any organization of employers, is hereby declared to be contrary to public policy and wholly void."

This statute is discussed in **24 O. Jur., page 642, paragraph 38.** After stating that **"Generally speaking, the right of employer to insist upon any agreement as a condition of obtaining employment from him, is well established,"** the author then discusses the **Jackson v. Berger** case, **92 Oh St, 130**, in which §12943 GC, was declared unconstitutional. (See above.)

Then the author says: "At the 1931 session of the (Ohio) legislature, however, a statute was enacted which very materially modifies the foregoing rule." (See Emphasized portion above.) Then he cites present §6241-1 GC, **supra.**

In this court's opinion, §6241-1 GC, is not unlike old §12943 GC, and is quite similar to the Kansas statute declared unconstitutional in the United States Supreme Court Coppage case cited above. (See page 132.) The only different feature perhaps is the application of the present statute to employers and employees alike by its mention of organizations. of employers and unions.

The court discusses this statute because it was called to the court's attention in connection with the closed shop contract presented by the Union to the employer here. In other words counsel claim that the contract presented would be and was illegal, and that therefore peaceful picketing is not permissible to further an illegal purpose.

In the case of **LaFrance Electric, etc. Co. v. Electrical Workers Local 8, etc., 108 Oh St, 61,** the company claimed that the union had entered into a conspiracy to ruin plaintiff's business in order to compel plaintiff to operate its business as **a closed union shop.** (See page 61 statement of facts.) The court permitted peaceful picketing. This would indicate that a closed shop demand is not an illegal purpose in this state. This is a very thorough opinion, and there are many enlightening discussions all through the opinion.

See also **Clarks Lunch Company v. Union (Waiters) 22 Oh Ap, 265,** cited and discussed briefly above.

In 1938 in White Allen Chevrolet Inc. v Union No. 314, etc., the **common pleas court** of Montgomery County **(27 Abs, 273)** ruled out peaceful picketing to obtain a closed shop. See Syllabus No. 2 and No. 3.

This case was some years before the A. F. of L. v. Swing case in the United States Supreme Court, and the trial court applied the rule on the basis of no trade dispute existing. It does not recognize or discuss the "free speech" doctrine later recognized by our United States Supreme Court. In view of the present law, there was a trade dispute in my opinion.

The case of Scaggs v. Transport Workers (our Ninth District Court of Appeals) **31 Abs 689,** decided in 1939, was not a case of picketing, etc., and concerned a **virtual monopoly of transportation,** and also was decided before the "free speech" decisions of the United States Supreme Court, and involved a different matter entirely than we have here.

The case of Fashioncraft Inc., v. Halpern, et al., 48 N. E. 2nd page 1, Mass. Supreme Court 1943. The court held in syllabus (8) "A strike to compel an employer to accede to union demands for a closed shop was not a 'lawful labor dispute' **within the statute** relating to injunctions." See also syllabi (1), (12), (13) and (14).

In the discussion by the court on pages 4 and 5 it is apparent that the State of Massachusetts has always regarded a strike for a closed shop as illegal, and in fact a tort, and therefore even peaceful picketing for such purpose is illegal and not permissible and may be enjoined. The court holds this true even taking into consideration the "freedom of speech" doctrine laid down by the United States Supreme Court. The court also holds (top of page 4): "on the other hand, agreements voluntarily made between an employer and union calling for a closed shop, have always been recognized and enforced in Massachusetts."

The State of Ohio, as far as I can see, upon examination of the law, has never gone this far as regards closed shop demands.

See 24 O. Jur., 639, "Closed Shop Agreements" supra.

The United States Supreme Court to my knowledge has never said that the right to peaceful picketing is lost where the object is to secure a closed shop. And attention is again called to the A. F. of L. v. Swing case discussed earlier.

Under the "free speech" doctrine of the United States Supreme Court, I would say the union would have just as much right to peacefully picket to secure a closed shop as any other proper demand. And even if you would conclude that a closed shop demand was illegal, they would still be allowed peaceful picketing where there were other proper demands being made, as in the instant case.

The court will refuse the injunction against peaceful picketing, and allow one picket at any given time under the same restrictions as have been imposed by Judge Harvey and this court.

When I permit peaceful picketing, I mean that. The court will not tolerate any violence or the like. Counsel know what is proper, and will instruct their clients accordingly.

The court costs will be taxed against both sides equally.

Exceptions to all parties.